IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

AVORY RAY JEFFRIES,

       **Plaintiff,**

**v.**                                   **Case No.: 3:10-cv-1405**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

       **Defendant.**

## MEMORANDUM OPINION

      This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter the "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. (Docket No. 1). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 4 and 5). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 9–11).

## I.   Procedural History

      Plaintiff, Avory Ray Jeffries (hereinafter "Claimant"), filed an application for DIB on May 7, 2007, alleging disability beginning July 15, 2003 due to depression; panic attacks; foot, neck, and knee pain; and borderline intellectual functioning. (Tr. at 102). The application was denied by the Social Security Administration (hereinafter "SSA") on October 3, 2007. (Tr. at 64–66). Claimant requested reconsideration and the SSA

denied Claimant's request for reconsideration on October 9, 2007. Thereafter, on December 10, 2007, Claimant filed a written request for a hearing before an administrative law judge (hereinafter "ALJ"). (Tr. at 69). The Honorable Michelle D. Cavadi, ALJ, presided over Claimant's hearing on January 14, 2009. (Tr. at 21–55). The ALJ denied Claimant's application by decision dated May 29, 2009. (Tr. at 9–20). The ALJ's decision became the final decision of the Commissioner on October 25, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1–3). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (Docket No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 7–11). Consequently, the matter is ripe for resolution.

## II.   **Claimant's Background**

Claimant was born on July 7, 1958 and was 48 years old at the time of his application for DIB and 50 years old at the time of his administrative hearing. (Tr. at 41–42). He has an eighth grade education and has had no formal vocational training. (Tr. at 27). Claimant has significant difficulty with reading and performing basic mathematics. (Tr. at 41–42). In the years preceding his alleged onset of disability, Claimant was employed as a carpenter and construction worker. (Tr. at 28).

## III.   **Relevant Medical Evidence**

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute. The record includes medical evidence that pre-dates Claimant's alleged disability onset date of

July 15, 2003 and evidence of medical treatment that follows Claimant's date last insured; that being, December 31, 2007. The Court considered this evidence to the extent that it provided a more accurate understanding of Claimant's medical background.

### A.   Medical Treatment

1.   *Prior to Disability Onset Date*

On May 1, 1974, Claimant took the Wide Range Achievement Test at Point Pleasant High School. (Tr. at 148–154). At that time, Claimant was in the eighth grade. The test revealed that Claimant read at a first grade level, spelled at a second grade level, and performed math at a fourth grade level. (Tr. at 148). The examiner, D. Edwards, noted that Claimant actually read beyond the first grade level but that the test was otherwise an accurate reflection of Claimant's classroom performance. (Tr. at 154). No specific weaknesses other than truancy were noted. (*Id.*).

On July 28, 1992, Claimant was seen by David E. Miller, DO, at Holzer Clinic for chronic pain and panic attacks. (Tr. at 187). Dr. Miller noted that Claimant's chronic pain had decreased and that Claimant was not experiencing panic attacks regularly. (*Id.*). Claimant had signs of chronic rhinitis that Dr. Miller hypothesized were a result of Claimant's history of smoking two packs of cigarettes per day. (Tr. at 185, 187). On January 13, 1993, Claimant returned to Holzer Clinic for an appointment with Dr. Miller. (Tr. at 184). Dr. Miller noted that Claimant suffered from panic attacks and mild depression. (*Id.*). Claimant reported that he had not been experiencing panic attacks recently but that he was under a lot of stress and very nervous because of marital problems with his wife. (*Id.*). Dr. Miller documented that Claimant was experiencing problems sleeping, was not suicidal, and was attending marriage

counseling with his wife. (*Id.*). Claimant requested a prescription for Xanax. (*Id.*). On February 15, 1993, Claimant returned to Holzer Clinic with complaints of insomnia and stress. (Tr. at 183). Dr. Miller prescribed Xanax for Claimant to use on a temporary basis. (*Id.*). On May 10, 1993, Claimant returned to Holzer Clinic for a follow-up appointment regarding his depression and panic attacks. (Tr. at 182). Dr. Miller noted that Claimant was doing better and that Claimant's marital problems had resolved. (*Id.*). Claimant reported using Xanax semi-regularly prior to bed and stated that he had not experienced any panic attacks recently. (*Id.*). On July 20, 1993, Claimant returned to Holzer Clinic for a follow-up appointment with Dr. Miller. (Tr. at 181). Dr. Miller opined that Claimant would be more successfully treated by a psychiatrist but that Claimant lacked the financial means to do so. (*Id.*). Claimant reported that he used Xanax infrequently but would take one or two pills on a "bad" day. (*Id.*). On September 16, 1993, Claimant returned to Holzer Clinic. (Tr. at 180). He reported that he was doing reasonably well although he was undergoing a divorce from his wife, which was very stressful. (*Id.*). Claimant stated that his wife was not helping provide care for their children. (*Id.*). Dr. Miller observed that Claimant still became nervous and shaky at times and expressed a desire for Claimant to begin treatment in the near future with a psychiatrist. (*Id.*). From December 1993 to October 1994, Claimant struggled with bronchitis, sinusitis, and asthma symptoms. (Tr. at 170–79). Numerous physicians examined Claimant during this time and attributed the extended duration of these symptoms to Claimant's smoking habit. (*Id.*).

On November 3, 1994, Claimant returned to Holzer Clinic and was examined by Lois Bosley, DO. (Tr. at 169). Claimant reported suffering from panic attacks and a history of depression. (*Id.*). Dr. Bosley felt that Claimant was suffering from depression

and discussed starting Claimant on Prozac. (*Id.*). Claimant was agreeable to the idea of starting Prozac. (*Id.*). On November 16, 1994, Claimant was seen by Dr. Bosley for a follow-up appointment. (Tr. at 168). Claimant's mood was unchanged but he had returned to work. (*Id.*). Dr. Bosley increased Claimant's dosage of Prozac to 20 mg per day. (*Id.*). On December 15, 1994, Claimant returned to Holzer Clinic for an appointment with Dr. Bosley. (Tr. at 167). Claimant reported that he was trying to decrease his tobacco use but that insurance would not cover the cost of a nicotine patch. (*Id.*). Dr. Bosley noted that Claimant's depression seemed to have been reduced through the use of Prozac although Claimant did not believe that Prozac had made a significant difference in his mood. (*Id.*).

On January 11, 1995, Claimant was examined by Dr. Bosley at Holzer Clinic for sinus and cold symptoms. (Tr. at 165). Claimant stated that he was a construction worker, which often required him to work at heights but that his sinus problems sometimes caused him to experience dizziness during work. (*Id.*). Based on Claimant's history of bronchitis and sinusitis, Dr. Bosley had a radiology report of Claimant's sinuses performed by Bruce Pennington, MD, DO. (Tr. at 166). Dr. Pennington noted mild membrane thickening in Claimant's right maxillary antrum, increased opacity in the region of the left ethmoid air cells, and no obvious bone destruction or air fluid level. (*Id.*). Claimant was next seen by John H. Viall, MD, on a referral from Dr. Bosley. (Tr. at 164). Dr. Viall noted that the previous x-rays reflected very mild maxillary sinusitis but that his own reading of the x-ray did not confirm this. (*Id.*). On April 7, 1995, Claimant reported to Dr. Bosley that he continued to experience intermittent anxiety. (Tr. at 162). On June 13, 1995, Claimant returned to Holzer Clinic with complaints of panic attacks. (Tr. at 161). Barbara A. Vizy, MD, discussed Claimant's

medical history and treatment plan with Claimant. (*Id.*). Claimant reported that Prozac made him nervous and that he continued to take Xanax when he started to feel like he might have a panic attack. (*Id.*). Dr. Vizy noted that Claimant described experiencing more stress recently because of family problems. (*Id.*). Dr. Vizy prescribed Serzone and recommended that Claimant continue taking Xanax. (*Id.*). On September 5, 1995, Claimant returned to Holzer Clinic with complaints of sinus pain; Claimant reported that he had been experiencing dizziness and congestion in the week proceeding his appointment. (Tr. at 159). Dr. Vizy thought Claimant might be experiencing symptoms of early sinusitis. (*Id.*).

On December 27, 1997, Claimant underwent outpatient x-rays of his chest and abdomen at Pleasant Valley Hospital. (Tr. at 202–05). The x-ray of Claimant's abdomen was normal, and the chest x-ray showed no evidence of active cardiopulmonary disease. (Tr. at 202). On August 6, 1998, Dr. Pennington reviewed anonther x-ray of Claimant's chest. (Tr. at 156). Dr. Pennington noted small calcified granulomas in the left perihilar region but found Claimant's lungs to be otherwise normal. (*Id.*). Dr. Pennington observed that Claimant's heart and mediastinum were within normal limits and concluded that the x-rays results revealed no significant changes from Claimant's last chest x-ray. (*Id.*). Also, on August 6, 1998, Claimant was seen by Glenn A. Fisher, MD, at Holzer Clinic for complaints of lung problems. (Tr. at 157). Dr. Fisher noted that Claimant was a heavy smoker of two packs per day for approximately 20 years. (*Id.*). Claimant reported experiencing shortness of breath. (*Id.*). Claimant stated that he drank four to six beers a day, had recently been laid off, and had experienced depression, panic attacks, and anxiety. (*Id.*). Dr. Fisher expressed concern over potential asbestos exposure in the past. (*Id.*). Dr. Fisher diagnosed

Claimant as suffering from dyspnea, COPD, obesity, panic attacks, depression, and nicotine abuse. (*Id.*).

On September 15, 1998, Claimant returned for a follow-up appointment with Dr. Fisher. (Tr. at 155). Dr. Fisher stated that Claimant's chest x-rays were normal but suggested mild early obstructive changes that were likely related to Claimant's heavy cigarette use. (*Id.*). Claimant's symptoms of anxiety and depression seemed to be fairly stable. (*Id.*). Claimant stated that he would like to increase his dosage of Xanax and expressed his desire to avoid other medications, particularly Prozac. (*Id.*). Dr. Fisher restated his earlier diagnosis of nicotine abuse, panic attacks, depression, and early COPD. (*Id.*). On January 6, 1999, Claimant was examined at Pleasant Valley Hospital for a possible fracture of his right hand. (Tr. at 196). Claimant reported that he had hit a wall. (*Id.*). X-rays of Claimant's right hand were read by Gerald Kelin, MD, who found that Claimant had a boxer's fracture of the fifth metacarpal. (Tr. at 198). Claimant's hand and arm were placed in a short cast. (Tr. at 199).

2.    *Relevant Time Period-July 15, 2003 through December 31, 2007*

On April 26, 2005, Claimant presented to the Emergency Department at Pleasant Valley Hospital with complaints of pain in his left shoulder, left upper extremity, and numbness of the elbow. (Tr. at 188–95). Claimant reported injuring himself several days earlier when carrying 12 eight by four sheet rocks. (Tr. at 190). Claimant stated that the pain seemed to increase as he lay down but that he had been able to hunt and walk without pain following the injury. (*Id.*). Although Claimant connected the pain to trauma, the Emergency Physician decided to rule out a cardiac component by ordering cardiac enzymes, and EKG, and a hest x-ray. The EKG was normal and the x-ray revealed that Claimant's cardiac silhouette was within normal

limits and his lungs had no definite evidence of acute consolidation, infiltrate, or effusion. (*Id.*).  The examining physician diagnosed Claimant with neck and thoracic pain with radiculopathy in his left upper extremity. (*Id.*).  He instructed Claimant to rest, apply moist heat to the area, refrain from lifting over 5 pounds, and follow up with Dr. Corn.  Claimant was discharged in good condition.  (*Id.*).

      3.    *Post-Date Last Insured*

On July 31, 2008, an unidentified health care provider examined Claimant as a new patient and noted "[q]uestions about fibromyalgia … unable to demonstrate presence of trigger points." (Docket No. 9-1 at 28). The treating health care provider diagnosed Claimant as suffering hypertension; anxiety associated with caring for his grandchildren; degenerative joint disease; and chronic lung problems. (*Id.*). On November 7, 2008, Joseph Skeens, MD, at Jackson General Hospital reviewed x-rays of Claimant's spine, knees, and chest. (Tr. at 257–58). Dr. Skeens found that Claimant's lumbosacral spine evidenced degenerative disc change with no acute fractures or subluxation. (*Id.*). Dr. Skeens noted that Claimant's knees showed no acute fractures and a mild degree of osteoarthritis. Claimant's thoracic spine indicated multilevel degenerative disc change with no acute fractures. (*Id.*). Similarly, Claimant's cervical spine showed evidence of advanced degenerative disc changes with no acute fractures or subluxation. (*Id.*). Claimant's chest evidenced no acute infiltrates. (*Id.*). On November 20, 2008, Claimant's primary care provider began empirical treatment of fibromyalgia with Lyrica. (Docket No. 9-1 at 26).

On July 22, 2009, Claimant presented to the Emergency Department at Pleasant Valley Hospital with complaints of pain in his hands, wrists, forearms, and elbows that had persisted for years. (Docket No. 9-1 at 2). The treating physician noted

that Claimant had worked in heavy construction for many years and diagnosed Claimant as suffering from carpal tunnel syndrome. (*Id.*). The treating physician recommended heat or ice to relieve the pain and prescribed wrist splints to be worn at night and during the day when possible. (*Id.*). On November 16, 2009, Claimant was seen by Robert Lewis, MD, at Pleasant Valley Neurophysiology Center for evaluation of intermittent numbness of both of Claimant's hands. (*Id.* at 5–8). Claimant reported numbness and wrist pain that worsened with activity and related a history of fibromyalgia with a burning sensation in his ankles and feet. (*Id.*). Dr. Lewis also documented that Claimant complained of stiffness in his right shoulder, which was caused by a fall that had occurred three weeks earlier, and secondary pain especially when he attempted to raise his right arm. (Docket No. 9-1 at 5). Claimant and Dr. Lewis discussed Claimant's presumptive diagnosis of carpal tunnel syndrome, and Dr. Lewis decided to schedule a number of tests to confirm the diagnosis. (*Id.* at 8). On November 30, 2009, Claimant returned to Pleasant Valley Hospital with complaints of persistent pain in his right shoulder. (*Id.* at 30–35). Claimant stated that he had not sought treatment earlier for his shoulder due to lack of insurance. (*Id.* at 30). Paul Akers, MD, reviewed x-rays of Claimant's shoulder and noted a mild irregularity superior aspect to the humeral head. (*Id.* at 32). Dr. Akers stated that the bony structure of Claimant's shoulder was otherwise normal. (*Id.*). Claimant denied any numbness, tingling, or weakness to any extremity; denied any neck pain or stiffness; and denied experiencing chest pain or shortness of breath. (Docket No. at 35). Also, on November 30, 2009, Claimant had a follow-up appointment with Dr. Lewis. (*Id.* at 9–10). Dr. Lewis reviewed the results of Claimant's tests and found that they showed moderate to severe right and moderate left carpal tunnel syndrome. (*Id.* at 10). Dr.

Lewis concluded that there was no evidence of ulnar neuropathies; and the reduced ulnary sensory nerve action and slightly prolonged left ulnar compound muscle action were determined to be non-specific in nature. (*Id.*). In addition, the results of an EMG study were consistent with chronic right C6/C7 radiculopathies, but there was no evidence of a myopathy. (*Id.*).

On June 28, 2010, Claimant returned to Holzer Clinic to re-establish primary care at that facility. (Docket No. 9-1 at 12–14). Claimant was examined by Bashar Atai, MD. (*Id.*). Claimant reported a history of hypertension, which Dr. Atai found was controlled by medication. (*Id.* at 13). Claimant denied experiencing chest pain or shortness of breath, but stated that he had COPD, fibromyalgia, anxiety, depression, chronic back pain, and carpal tunnel syndrome. (*Id.*). Dr. Atai discussed a proposed treatment plan with Claimant and scheduled a follow-up appointment with Claimant for August. (*Id.* at 14). On August 30, 2010, Claimant was examined by Dr. Atai. (*Id.* at 37). X-rays of Claimant's spine showed no fractures or spondylolysis, but reflected the existence of mild degenerative disc disease at L1-2, L3-4, L4-5, and L5-S1 with well-maintained disc spaces. (*Id.* at 38). Dr. Atai reviewed Claimant's recent laboratory studies and noticed a finding of hyperglycemia consistent with type 2 diabetes mellitus. (*Id.* at 39). Dr. Atai counseled Claimant on dietary changes to help Claimant lower his glucose; such as, avoiding carbohydrates and eating smaller portions. (*Id.*) On September 8, 2010, Claimant was examined by Dr. Atai at Holzer Clinic. (*Id.* at 16–17). Claimant complained of sinus pain and persistent coughing. (Docket No. 9-1 at 16). Dr. Atai diagnosed Claimant as suffering from acute sinusitis and acute bronchitis. (*Id.*).

**B.**   **Agency Evaluations**

1.   *Physical Health Assessments*

On June 13, 2007, Kathleen M. Monderewicz, MD, completed an internal medicine examination at the request of the West Virginia Disability Determination Service ("DDS"). (Tr. at 206–13). Claimant advised that he was claiming disability as a result of pain in his neck, lower back, knees, and feet. (Tr. at 206). Claimant reported suffering from back pain since a fall of 22-25 feet from a two story house in 1987. Claimant did not suffer any fractures but was hospitalized for three days. Claimant did not undergo physical rehabilitation following this fall but was provided with home exercises to help rehabilitate on his own. Claimant reported that the back pain began over the center of his lower spine and radiated down into both hips. Claimant did not experience paresthesias in his lower extremities. He described difficulty in bending, stooping, and with motions that involved twisting of the back. Claimant expressed difficulty riding in a car for more than one hour or lifting more than 25 pounds. With respect to his neck pain, Claimant stated that it had begun in 1990 when a 40 pound rock struck him in the back of the neck. Claimant was evaluated at the hospital and remained off of work for three to four days following the accident. He denied that any bones were fractured as a result of the accident. Dr. Monderewicz noted that the pain began around the C7 vertebrate and radiated into Claimant's left upper extremity. Claimant also reported experiencing numbness and tingling into his left hand and that his thumb and index finger tend to cramp up while driving. Claimant did not indicate any history of carpal tunnel syndrome. Claimant then described the pain in his knees to Dr. Monderewicz. Claimant stated that the pain had become progressively worse over the past several years but did not note any swelling, redness, or warmth of his

knees. Claimant reported that his bilateral foot pain had begun to increase over the past year and radiated from his heels to his toes. Claimant noted that his foot pain was particularly severe after prolonged standing and walking. Claimant also stated that sitting for long periods of time made his foot pain worse. Dr. Monderewicz noted that there were no medical records available for review. (Tr. at 207). Dr. Monderewicz provided the following description:

> [Claimant] ambulates with a mild left limp. He reports preferring to wear boots or high top shoes due to instability of the ankle joints. [Claimant] does not require the use of a handheld assistive device. [He] appears stable at station and comfortable in the sitting position, but uncomfortable in the supine position. Intellectual functioning appears normal during the examination. [Claimant's] hearing appears to be adequate for normal conversation. [His] speech appears clear without impediment. Recent and remote memory for medical events is good and [Claimant] is considered reliable.

(Tr. at 208). Following a physical examination of Claimant, Dr. Monderewicz diagnosed Claimant as suffering from: chronic cervical strain, chronic lower back pain, chronic knee pain, and probable plantar fasciitis. (Tr. at 210). In summary, Dr. Monderewicz found that:

> [Claimant's] ability to engage in prolonged standing and walking are limited due to the probable plantar fasciitis as well as the knee pain. Frequent squatting as well as kneeling and crawling would be limited due to the chronic knee pain. Bending, stooping, lifting, carrying, and traveling are limited due to the chronic low back pain as well as the paresthesias to the left hand associated with the neck pain. No limitation is noted in [Claimant's] ability to sit, hear or speak.

(Tr. at 210–11).

Also on June 13, 2007, Andrew Goodwin, MD, reviewed x-rays of Claimant's spine, legs, and feet at Tri State Occupational Medicine.[1] (Tr. at 214). Dr. Goodwin found narrowed fifth and sixth cervical interspaces with degenerative changes in the

---

[1] These x-rays were ordered and reviewed as part of Dr. Monderewicz's internal medicine examination.

lower cervical spine. (*Id.*). Otherwise, Dr. Goodwin noted no bony or soft tissue abnormalities. (*Id.*). With respect to Claimant's feet, Dr. Goodwin noted no abnormalities and no evidence of recent injury. (*Id.*). With respect to Claimant's knees, Dr. Goodwin noted a tiny island of bony sclerosis in Claimant's distal right femur but otherwise no evidence of injury or other abnormalities. (*Id.*).

On July 18, 2007, Uma Reddy, MD, completed a Physical Residual Functional Capacity Assessment (RFC) at the request of the SSA. (Tr. at 238–45). She found that Claimant could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in his ability to push or pull. (Tr. at 239). Dr. Reddy identified numerous postural limitations. Claimant could only occasionally engage in work activities that required: climbing ramps, stairs, ladders, ropes or scaffolds; balancing; stooping; kneeling; crouching; or crawling. (Tr. at 240). Dr. Reddy identified no manipulative, visual, or communicative limitations, but determined that Claimant was subject to several environmental limitations. (Tr. at 241–42). Dr. Reddy concluded that Claimant should avoid concentrated exposure to extreme cold; extreme heat; vibrations; and fumes, odors, dusts, gases, poor ventilation, etc. (Tr. at 242). Further, Claimant should avoid even moderate exposure to hazards, such as machinery and heights. (*Id.*). After reviewing the medical record, Dr. Reddy recorded Claimant's daily activities. (Tr. at 243). Claimant stated that he had trouble sleeping due to constantly worrying but was otherwise able to perform self-care, cook, clean, mow the lawn, drive, run errands, and watch television. (*Id.*). Claimant reported that he spoke to family by phone, but that he was easily irritated around others. (*Id.*). Claimant stated that he had problems in the postural, manipulative, and psychological areas of the ADL form. (*Id.*). Next, Dr. Reddy

evaluated Claimant's symptoms in the context of the Listings:

> [Claimant is a] 49 years (sic) old obese built male with allegations of back, neck, knee, and foot pain, partially credible with supporting medical evidence . . . , but no listing limits. He takes some OTC pain meds as needed. He has some mental problems.
>
> Considering the whole picture his RFC is reduced as noted here, but no listing limitations.

(*Id.*). On September 26, 2007, Amy Wirts, MD, completed a case analysis at the request of the SSA. (Tr. at 247). Dr. Wirts reviewed the medical record and affirmed Dr. Reddy's RFC as written. (*Id.*).

### 2.    *Mental Health Assessments*

On June 5, 2007, Catherine Van Verth Sayre, MA, completed an Adult Mental Profile at the request of the SSA. (Tr. at 215–18). Claimant informed Ms. Sayre that he was applying for disability due to back and knee pain and difficulty in reading and writing. (Tr. at 215). Claimant stated that he began suffering panic attacks in 1986 or 1987 and had not worked since 2003. (*Id.*). Ms. Sayre recorded Claimant's description of his panic attacks, anxiety, and depression:

> [Claimant] states that his panic attacks include chest pain, sweating, heart beats harder, and left hand goes numb. He states that he has had to leave things in stores because of these feelings and does not like to go far away from home. He states that he has problems with being irritable and worries about things. He states that he does not like to be around people. He reports that he found his father dead from a gunshot wound and he feels guilty that he could not help him. He states that he does think about it from time to time but denies any other problems with it.
>
> He states that he has problems with depression. He states that he feels like he wants to cry and feels hopeless. He reports that he is easily distractible. He has problems with sleeping at night and will be up every hour unless he drinks before he goes to bed. He states that his appetite comes and goes. [Claimant] states that he has thoughts about suicide but he denies any homicidal ideation. He has no intent of committing suicide on this date.

(*Id.*). Claimant explained that he suffered from pain in his neck, back, knees, and feet. (*Id.*). He further stated that he had hypertension and smoked two or more packs of cigarettes per day. (Tr. at 216). Ms. Sayre noted that Claimant reported drinking four to ten beers every night to relax and sleep. (*Id.*). Claimant denied that drinking affected his ability to work, but his wife, who accompanied Claimant to the evaluation, expressed unhappiness with Claimant's alcohol intake. (*Id.*). Ms. Sayre found that Claimant's thought process, thought content, perception, insight, psychomotor, immediate memory, remote memory, persistence, pace, and social functioning were all within normal limits. (*Id.*). In contrast, Ms. Sayre concluded that Claimant's: judgment was impaired; recent memory was severely impaired; and concentration was moderately impaired. (*Id.*). With respect to social functioning, Claimant stated that he had friends but that he did not see them often. (Tr. at 217). Claimant's wife reported that Claimant's cousin often visited Claimant and that he had close relationships with his brother and sister. (*Id.*). With respect to daily activities, Claimant indicated that he performed maintenance and upkeep of his property, mowed his sister's law, gardened, and performed odd jobs for family members. (*Id.*). Based on her examination of Claimant, Ms. Sayre diagnosed Claimant as suffering from panic disorder with agoraphobia; major depressive disorder, recurrent, moderate; alcohol abuse; reading disorder; and borderline intellectual functioning. (Tr. at 217–18). Ms. Sayre provided the following explanation for her diagnosis:

> The diagnosis of Panic Disorder with Agoraphobia is given because of anxiety symptoms that include chest pain, tachycardia, sweating, and numbness in hands with avoidance of social situations. The diagnosis of Major Depressive Disorder is given because of depressed mood, poor sleep, poor appetite, suicidal ideation, and distractibility. The diagnosis of Alcohol Abuse is given because of daily alcohol use with social

> impairment. The diagnosis of Reading Disorder is given because of reading scores that are significantly lower than would be expected given his IQ scores. The diagnosis of Borderline Intellectual Functioning is given because of IQ scores in the 70's.

(Tr. at 218). Ms. Sayre found that Claimant's prognosis was "fair" and concluded that he was capable of managing his own benefits. (*Id.*).

On July 17, 2007, Holly Cloonan, Ph.D, conducted a Psychiatric Review Technique (PRT) at the request of the SSA. (Tr. at 219–32). Dr. Cloonan diagnosed Claimant with Borderline Intellectual Functioning and a reading disorder. (Tr. at 220). With respect to Claimant's history of depression, Dr. Cloonan found that Claimant suffered from moderate recurrent Major Depressive Disorder. (Tr. at 222). Dr. Cloonan also diagnosed Claimant with a panic attack disorder with agoraphobia. (Tr. at 224). Next, Dr. Cloonan evaluated Claimant's functional limitations and concluded that Claimant had: mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 229). After reviewing the medical record, Dr. Cloonan found that the evidence did not establish the presence of paragraph C criteria. (Tr. at 230). Next, Dr. Cloonan reviewed Claimant's medical records. (Tr. at 231). Dr. Cloonan noted that school records indicated that Claimant was illiterate and read at the 1.5 grade level when he was in eighth grade. (*Id.*). Treatment records from Holzer Clinic indicated that he was diagnosed with panic attack disorder in January of 1993 and continued treatment through September 1998. (*Id.*). Records from Prestera Center from June 5, 2007 showed that Claimant was easily irritated, anxious, depressed, and experienced feelings of hopelessness, problems sleeping and thoughts of suicide in addition to physical symptoms common

to panic attacks. (*Id.*). Dr. Cloonan recorded Claimant's description of his daily activities. (*Id.*). Claimant stated that he had trouble sleeping due to excessive worry, but that he was able to perform self-care, cook, clean, mow the lawn, drive, run errands, and watch television. (*Id.*). Claimant reported that he spoke to family by phone, but that he was easily irritated around others. (Tr. at 231). Claimant stated that he had problems in the postural, manipulative, and psychological areas of ADL form. (*Id.*). In conclusion, Dr. Cloonan stated:

> [Claimant] & 3rd party appear credible in his report of a psychiatric condition & learning problems as substantiated by school records & results of testing at the CE. He is also forthcoming about alcohol abuse. [Claimant] does not take any medication and has not sought treatment for his current psychiatric [diagnosis].

(*Id.*).

Also, on July 17, 2007, Dr. Cloonan completed a Mental Residual Functional Capacity Assessment at the request of the SSA. (Tr. at 234–37). A Mental Functional Capacity Assessment addresses four broad areas of a claimant's mental functioning: understanding and memory; sustained concentration and persistence; social interaction; and adaptation. First, Dr. Cloonan evaluated Claimant's understanding and memory and found that Claimant's ability to: (1) remember locations and work-like procedures was moderately limited; (2) understand and remember very short and simple instructions was not significantly limited; and (3) understand and remember detailed instructions was markedly limited. (Tr. at 234). Second, Dr. Cloonan analyzed Claimant's mental functioning with respect to sustained concentration and persistence. Dr. Cloonan found that Claimant's ability to: (1) carry out very short and simple instructions was not significantly limited; (2) carry out detailed instructions was markedly limited; (3) maintain attention and concentration for extended periods was

moderately limited; (4) perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances was moderately limited; (5) sustain an ordinary routine without special supervision was not significantly limited; (6) work in coordination with or proximity to others without being distracted by them was moderately limited; (7) make simple work-related decisions was not significantly limited; (8) complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was moderately limited. (Tr. at 234–35). Third, Dr. Cloonan evaluated Claimant's mental functioning in terms of social interaction. (Tr. at 235). Dr. Cloonan concluded that Claimant's ability to: (1) interact appropriately with the general public was moderately limited; (2) ask simple questions or request assistance was not significantly limited; (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes was not significantly limited; and (4) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness was not significantly limited. (*Id.*). Fourth. Dr. Cloonan analyzed Claimant's mental functioning in terms of adaptation. (*Id.*).  Dr. Cloonan found that Claimant's ability to: (1) respond appropriately to changes in the work setting was moderately limited; (2) be aware of normal hazards and take appropriate precautions was not significantly limited; (3) travel in unfamiliar places or use public transportation was not significantly limited; and (4) set realistic goals or make plans independently of others was not significantly limited. (*Id.*). At the end of her assessment, Dr. Cloonan concluded that Claimant's limitations were a result of his Borderline Intellectual Functioning and his psychiatric diagnosis. (Tr. at 236). Claimant reported difficulty in interacting with others and Dr. Cloonan stated that his

anxiety was exacerbated by stressful interactions with others in the workplace. (*Id.*). With respect to Claimant's claim of disability, Dr. Cloonan stated that Claimant's condition did not meet or equal the severity level of the listing. (*Id.*). Therefore, Dr. Cloonan recommended that Claimant work in a job with simple activities with low productions demands and limited interactions with others in a low stress work environment. (*Id.*). On September 29, 2007, James Binder, MD, completed a case analysis at the request of the SSA. (Tr. at 249). Dr. Binder reviewed the medical record and affirmed Dr. Cloonan's evaluations of Claimant as written. (*Id.*).

**IV.     Summary of the ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability.  See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims.  If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied.  20 C.F.R. § 404.1520.  The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment.  *Id.*  § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment.  *Id.*  § 404.1520(c).  If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.*  § 404.1520(d).  If the impairment does, then the claimant is found

disabled and awarded benefits.  However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f).  If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  *Id.* § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).  The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy.  *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §

404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).

In this particular case, the ALJ determined, as a preliminary matter, that Claimant met the insured status requirements of the Social Security Act through December 31, 2007. (Tr. at 14, Finding No. 1).  The ALJ found that Claimant had not engaged in substantial gainful activity between July 15, 2003, the date of his alleged disability onset date, and December 31, 2007, his date last insured. (*Id.*, Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: alcohol abuse; chronic obstructive pulmonary disease (COPD); borderline intellectual functioning; reading disorder; panic disorder; major depressive disorder; and neck, back, and right knee strain. (*Id.*, Finding No. 3). The ALJ acknowledged Claimant's complaints of arm and hand impairments but found

that there was no medical evidence to support the conclusion that these conditions were severe prior to the date last insured. (*Id.*). At the third inquiry, the ALJ examined Claimant's severe impairments, as well as all of his impairments in combination, and concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 14–15, Finding No. 4). The ALJ then found that Claimant had the following RFC:

> [T]o perform medium work involving lifting and carrying 50 pounds occasionally and 25 pounds frequently; sitting, standing and/or walking for 6 hours in an 8 hour workday with occasional climbing, stooping, kneeling, crouching, crawling, balancing; avoid concentrated exposure to extreme heat and cold; avoid vibration, fumes, odors, gases, dusts, poor ventilation; avoid even moderate exposure to hazards; work should involve only routine adaptation to changes; no contact with the public, occasional contact with coworkers and supervisors; and work must be learned in one or two steps, by oral instructions (20 CFR 404.1567(c)).

(Tr. at 15, Finding No. 5).

As a result, the ALJ found that Claimant could not return to his past relevant employment as a carpenter. (Tr. at 19, Finding No. 6). The ALJ considered that Claimant: was 49 years old at the time of his application for DIB benefits; he had a marginal education; and was able to communicate in English. (*Id.*, Finding Nos. 7 and 8). The ALJ noted that the transferability of Claimant's job skills was not material because, under the Medical-Vocational Rules, the evidence supported a finding that Claimant was "not disabled" regardless of whether he had transferable job skills. (*Id.*, Finding No. 9).  Considering Claimant's age, education, work experience, RFC and relying upon the testimony of a vocational expert, the ALJ concluded that Claimant could perform jobs such as a surveillance system monitor; grader/sorter; bench worker; hand packager; product inspector; unarmed night watchman; machine tender; dishwasher; and laundry worker. (Tr. at 19–20, Finding No. 10). On this basis, the ALJ

determined that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 20, Finding No. 11).

## V.    Claimant's Challenges to the Commissioner's Decision

Claimant argues that the Commissioner's decision is not supported by substantial evidence because the ALJ (1) failed to evaluate Claimant's disability under the "combination of impairments listing;" (2) erred in her determination of Claimant's credibility; and (3) failed to consider the opinions of Claimant's treating physicians. Having thoroughly considered the evidence and the arguments of counsel, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## VI.    Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001)). The Commissioner, not the Court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453,

1456 (4th Cir. 1990). As such, the Court will not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Id.* The Court's obligation is to "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

## VII.  <u>Analysis</u>

### A.  **Remand for New Evidence**

Claimant submitted additional medical records in support of his three challenges to the Commissioner's decision. These medical records, which document subsequent diagnoses of carpal tunnel syndrome, fibromyalgia, shoulder pain, and diabetes mellitus, significantly post-date Claimant's last insured date and were not submitted to the ALJ or to the Appeals Council with Claimant's request for review. Nonetheless, Claimant encourages the Court to consider them, at a minimum, in evaluating the credibility of Claimant's testimony at the administrative hearing. (Pl.'s Br. at 1).  In light of the Court's limited role, which is confined to a review of the record before the Commissioner at the time of his final decision, the Court is precluded from considering evidence that was never submitted to the Commissioner. *See Smith v. Chater*, 99 F.3d 635, 638 n. 5 (4th Cir. 1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963)); *See, also, Deane v.*

*Commissioner of Soc. Sec. Admin.,* 428 Fed. Appx. 254 (4th Cir. 2011) (unpublished); *Bragg v. Astrue,* 2010 WL 3463994 (N.D.W.V. Sep. 3, 2010). Thus, the records are improperly presented for *de novo* review and will not be considered when evaluating whether the Commissioner's decision was supported by substantial evidence and based upon a correct application of the law.

Alternatively, Claimant moves the Court to order a remand instructing the Commissioner to consider Claimant's newly submitted evidence, because it verifies the existence of conditions he alleged, but could not prove, at the time of his administrative hearing. (Pl.'s Br. at 1). In response, the Commissioner does not address this argument beyond stating that "the evidence on which [Claimant] relies is all dated at least one year after [Claimant's] DLI and unrelated to the relevant time period, July 15, 2003 to December 31, 2007." (Resp.'s Br. at 9). Title 42 U.S.C. § 405(g) provides that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." The claimant may submit new evidence at any stage of the administrative procedure. *See* 20 C.F.R. §§ 404.970(b), 416.1470(b). New evidence submitted once the case is filed for district court review will only trigger a remand if it meets the criteria set out in *Miller v. Barnhart*, 64 F. App'x 858, 859 (4th Cir. 2003). In *Miller,* the Fourth Circuit Court of Appeals held that new evidence merits a remand if: (1) the evidence is relevant to the determination of disability at the time the application(s) was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before her; (3) there is good cause for the claimant's failure to

submit the evidence when the claim was before the Commissioner; and (4) the claimant makes at least a general showing of the nature of the new evidence to the reviewing court. *See Miller*, 64 F.App'x at 859 (citing *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985)); 42 U.S.C. 405(g)); *Wilkins v. Sec'y, Dep't of Health and Human Servs.*, 953 F.2d 93, 96 n.3 (4th Cir. 1991).[2]

For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was not in existence or available to the claimant at the time of the administrative proceeding and is not "duplicative or cumulative." *Wilkins*, 953 F.2d at 96. Such evidence is "material" only if there is a reasonable possibility that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence. *Bradley v. Barnhart*, 463 F.Supp.2d 577, 579 (S.D.W.V. 2006) (citing *Bruton v. Massanari,* 268 F3d. 824 (9th Cir. 2001)). A claimant shows "good cause" by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the administrative proceedings before the Commissioner. The burden of showing that a remand is appropriate is on the claimant. *See Fagg v. Chater,* 1997 WL 39146, at *2 (4th Cir. 1997); *Ferguson v. Commissioner of Social Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (citing *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001)).

Beyond requesting remand, Claimant has presented no legal argument addressing the standard set forth in 42 U.S.C. § 405(g) and *Miller*. Nevertheless, the

---

[2] Although *Borders* was superseded by statute, 42 U.S.C. § 405(g), as recognized in *Wilkins v. Sec'y, Dept. of Health and Human Servs.,* 925 F.2d 769, 774 (4th Cir. 1991), and *Wilkins* itself was subsequently vacated, courts in the Fourth Circuit have continued to rely on the *Borders* four-part test. *Wood v. Astrue,* 2011 WL 1002874, at *4 n.3 (D.S.C. Feb. 23, 2011) ("the Fourth Circuit has continued to cite *Borders* as the authority on the requirements for new evidence when presented with a claim for remand based on new evidence, and the U.S. Supreme Court has not suggested that the *Borders* construction of § 405(g) is incorrect."). *Smith v. Astrue*, 2011 WL 5117571, at *4 n.3 (W.D.Va. Oct. 26, 2011).

Court recognizes that Claimant's additional evidence does satisfy the criteria of "new" evidence because it was not in existence at the time the application was first filed and is not duplicative or cumulative of Claimant's existing treatment records. Claimant's new evidence details his diagnosis and treatment for fibromyalgia, carpal tunnel syndrome, shoulder pain, and diabetes mellitus following his administrative hearing before the ALJ. (Docket No. 9-1 at 1–39). On November 20, 2008, an unidentified treating source examined Claimant and began treating him for fibromyalgia. (*Id.* at 27–28). Claimant was prescribed Lyrica and Lexapro to treat his fibromyalgia and continued to receive treatment from November 2008 to September 2010. (*Id.* at 16–28). Claimant was first diagnosed with carpal tunnel syndrome in July 2009. (*Id.* at 2). On November 16, 2009, Claimant was seen by Robert Lewis, MD, at Pleasant Valley Neurophysiology Center for evaluation of intermittent numbness of both of Claimant's hands. (*Id.* at 5–8). On November 30, 2009, Dr. Lewis reviewed the results of Claimant's lab tests and found that they showed moderate to severe right and moderate left carpal tunnel syndrome. (*Id.* at 10). Also on November 30, 2009, Claimant received treatment for pain in his right shoulder. Paul Akers, MD, reviewed x-rays of Claimant's shoulder and noted a mild irregularity superior aspect to the humeral head of Claimant's shoulder. (Docket No. 9-1 at 32). Dr. Akers stated that the bony structure of Claimant's shoulder was otherwise normal. (*Id.*). On August 30, 2010, Dr. Atai at Holzer Clinic diagnosed Claimant as suffering from diabetes mellitus. (Tr. at 37–39). None of these issues were addressed by any of Claimant's medical records from the relevant time period and, thus, satisfy the criteria for new evidence as they are not duplicative or cumulative and were not in existence at the time of the hearing. In addition, these new records satisfy the requirement that the claimant must

make at least a general showing of the nature of the new evidence to the reviewing court.

However, Claimant's new evidence fails to satisfy the remaining requirements necessary to warrant a remand under *Miller*. First, Claimant's new evidence is not relevant to a determination of disability made at the time Claimant's DIB application was filed or pending before the SSA. *At the time of his application*, Claimant's disability claim was based on "[d]epression, panic attacks, neck, knee and feet pain, [and an inability to] read or write." (Tr. at 102). Although Claimant testified regarding symptoms of carpal tunnel syndrome, his recent diagnosis of fibromyalgia, and pain in his left shoulder at the administrative hearing in 2009 (Tr. at 26-27, 30-31, 46-47), *during the relevant time frame*, no treating source or state agency physician diagnosed Claimant as suffering from fibromyalgia, carpal tunnel syndrome, shoulder pain, or diabetes mellitus and Claimant received no treatment for these conditions. Significantly, all of Claimant's new evidence post-dates his last insured date by at least six months.[3] Moreover, the physicians who created Claimant's new evidence do not attempt to make any *ex post* diagnosis of Claimant's impairments or functional

---

[3] Claimant's shoulder pain was related to a fall he sustained in October 2009 and unequivocally post-dated the expiration of his insurance. Likewise, his diabetes was diagnosed by a laboratory result in 2010, rather than from symptoms, and was treated by changes in diet. Claimant alleges that he had fibromyalgia and carpal tunnel syndrome during the insured period; however, even if true, the existence of these syndromes does not shed light on the severity, intensity, or persistence of any associated symptoms or their disabling effects. Fibromyalgia is a common syndrome in which a person has long-term, body-wide pain. The pain varies greatly from person to person and waxes and wanes; the pain symptoms can resolve simply by eating a well-balanced diet, avoiding caffeine, and practicing good sleep routines. *See A.D.A.M.,* National Center for Biotechnology Information, National Library of Medicine, 2011. Similarly, the symptoms of carpal tunnel syndrome are variable. Symptoms usually start gradually and may be treated with exercises, nonsteroidal anti-inflammatory medications, and vitamin B6 supplements. If surgery is required, carpal tunnel release is one of the most common surgical procedures performed in the United States and may provide immediate relief. The majority of patients treated for carpal tunnel syndrome recover completely. *See NIH Publication No. 03-4898,* National Institute of Neurological Disorders and Stroke, National Institutes of Health, 2002. In view of the individualized effects of these conditions on sufferers, Claimant's diagnoses, made a year or more after the date last insured, are not particularly relevant to the issues in dispute.

limitations during the relevant time period. Nothing in these new records addresses the central question that the Commissioner was required to decide at the time Claimant's application was pending: whether or not Claimant was disabled during the relevant time period. Therefore, the Court finds that these records are both irrelevant and immaterial. Because Claimant has produced no medical evidence establishing the existence, severity, or disabling effects of fibromyalgia, carpal tunnel syndrome, his shoulder injury, and diabetes mellitus prior to his date last insured, the Court finds that Claimant has failed to satisfy the requirements that the new evidence (1) be "relevant to the determination of disability *at the time the application was first filed,*" *Miller*, 64 F.App'x at 859 (citing *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985)) (emphasis added) and (2) might reasonably have changed the Commissioner's decision. Thus remand is inappropriate.

Second, Claimant has failed to provide reasonable justification for his failure to acquire and present some or all of the evidence in question for inclusion in the administrative proceedings before the Commissioner. Claimant filed an application for DIB benefits on May 7, 2007. (Tr. at 102). His administrative hearing took place on January 14, 2009. (Tr. at 21–55). The ALJ issued her decision on May 29, 2009. (Tr. at 9–20). The Appeals Council issued a decision denying Claimant's request for review on October 25, 2010. (Tr. at 1–3). As Claimant was free to submit new evidence at any stage of the administrative proceedings,[4] he must now show good cause for failing to present the subsequent treatment records prior to October 25, 2010, the date on which the Commissioner's decision became final. In his brief, Claimant provides no explanation for his failure to present these records to the ALJ or the Appeals Council.

---

[4] *See* 20 C.F.R. §§ 404.970(b), 416.1470(b).

Claimant's records of his fibromyalgia diagnosis and treatment from July 31, 2008 through March 18, 2009 (Docket No. 9-1 at 21–22, 25–28) could have been submitted to the ALJ for her consideration prior to her decision on May 29, 2009. Claimant's new evidence also includes records of continued fibromyalgia treatment from June 10, 2009 through September 8, 2010 (*Id*. at 16–21, 23–24); diagnosis and treatment of carpal tunnel syndrome from July 22, 2009 through June 28, 2010 (*Id*. at 2–14); diagnosis and treatment for shoulder pain on November 30, 2009 (*Id*. at 30–35); and diagnosis and treatment for diabetes mellitus on August 30, 2010 (*Id*. at 37–39). All of these records could have been submitted to the Appeals Council prior to its October 25, 2010 decision denying review. Claimant offers no factual basis or argument to explain or justify his failure to produce these records while his application for DIB was pending before the SSA.  As such, this Court does not find good cause for Claimant's delay and, therefore, concludes that Claimant has failed to satisfy the criteria necessary to warrant remand on this ground.

### B.     Impairments in Combination

Claimant argues that he has several severe impairments that in combination are sufficient to establish disability. (Pl.'s Br. at 19). Specifically, Claimant asserts that:

> his substantial back troubles ranging from the lumbar up to the neck are debilitating – particularly when those difficulties are combined with the fibromyalgia which [Claimant] testified about in the hearing and which has since been diagnosed. Further, [Claimant] testified about having Carpal Tunnel Syndrome and that has also been formally diagnosed after the hearing.

(*Id*.). A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. The purpose of the Listing is to describe "for each of the major

body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). Inasmuch as the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Sullivan*, 493 U.S. at 530.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a listed impairment. *Id.* at 520; *See also* 20 C.F.R. § 404.1526. In Title 20 C.F.R. § 404.1526, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. § 404.1526(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment. § 404.1526(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be

proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *See, e.g.,* § 404.1526(b)(3).

As the Supreme Court clearly explained in *Sullivan*, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment . . . A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531.[5] Ultimately, to determine whether a combination of impairments equals the severity criteria of a listed impairment, the signs, symptoms, and laboratory data of the combined impairments must be compared to the severity criteria of the Listing. "The functional consequences of the impairments ... irrespective of their nature or extent, *cannot* justify a determination of equivalence." *Id.* at 532 (citing SSR 83-19).[6]

Here, the ALJ determined that Claimant had the following severe impairments: alcohol abuse; chronic obstructive pulmonary disease (COPD); borderline intellectual functioning; reading disorder; panic disorder; major depressive disorder; and neck,

---

[5] The Supreme Court explained the equivalency concept by using Down's syndrome as an example. Down's syndrome is "a congenital disorder usually manifested by mental retardation, skeletal deformity, and cardiovascular and digestive problems." *Id.* At the time of the *Sullivan* decision, Down's syndrome was not an impairment included in the Listing. Accordingly, in order to prove medical equivalency to a listed impairment, a claimant with Down's syndrome had to select the single listing that most resembled his condition and demonstrate fulfillment of the criteria associated with that listing.

[6] SSR 83-19 has been rescinded and replaced with SSR 91-7c, which addresses only medical equivalence in the context of SSI benefits for children. However, the explanation of medical equivalency contained in *Sullivan v. Zembly* remains relevant to this case.

back, and right knee strain. (20 CFR 404.1520 (c)). (Tr. at 14). Claimant does not identify any listed impairment that he might satisfy based upon his combination of impairments. However, as Claimant's severe impairments impact his musculoskeletal system, respiratory system, and mental functioning, the ALJ properly examined Claimant's impairments in combination under Listing 1.02 (Major dysfunction of a joint(s)), Listing 3.00 (Respiratory System), Listing 12.02 (Organic mental disorders), Listing 12.04 (Affective disorders), Listing 12.06 (Anxiety-related disorders), and Listing 12.09 (Substance addictions disorders).

To satisfy the criteria for Listing 1.02, Claimant must demonstrate that his impairments in combination are medically equal to a major dysfunction of a joint:

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; OR
>
> B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

After reviewing the medical evidence, the ALJ found that Claimant's neck, back and knee pain in combination did not meet or equal the criteria in Listing 1.02. (Tr. at 15). This conclusion is supported by substantial evidence. Medical records from the relevant time period indicate mild degenerative deterioration of Claimant's spine and no significant abnormalities with Claimant's neck or knees. (Tr. at 188–94, 214). Claimant reported being able to perform self-care, cook, clean, mow the lawn, drive,

run errands, and watch television. (Tr. at 243). No treating source prescribed anything more than over-the-counter medication for Claimant's neck, back, and knee pain impairment. No treating source or agency physician found that Claimant's neck, back, or knee pain prevented him from ambulating effectively or resulted in an inability to perform fine and gross movements effectively. Therefore, as Claimant's impairments do not satisfy the requisite severity criteria of the listing, Claimant has not established disability under Listing 1.02.

Similarly, Claimant is unable to meet or equal the criteria of any impairment contained in Listing 3.00. The two most relevant impairments, Listing 3.02 (Chronic pulmonary insufficiency) and Listing 3.09 (Cor pulmonale secondary to chronic pulmonary vascular hypertension) exemplify this conclusion. To satisfy the criteria for Listing 3.02, Claimant must demonstrate:

(A) Chronic obstructive pulmonary disease due to any cause, with the FEV equal to or less than the values specified in table I corresponding to the person's height without shoes; **or**

(B) Chronic restrictive ventilatory disease, due to any cause, with the FVC equal to or less than the values specified in Table II corresponding to the person's height without shoes; **or**

(C) Chronic impairment of gas exchange due to clinically documented pulmonary disease. With:

1. Single breath DLCO less than 10.5 ml/min/mm Hg or less than 40 percent of the predicted normal value. (Predicted values must either be based on data obtained at the test site or published values from a laboratory using the same technique as the test site. The source of the predicted values should be reported. If they are not published, they should be submitted in the form of a table or nomogram); **or**

2. Arterial blood gas values of $PO_2$ and simultaneously determined $PCO_2$ measured while at rest (breathing room air, awake and sitting or standing) in a clinically stable condition on at least two occasions, three or more weeks apart within a 6-month period,

equal to or, less then the values specified in the applicable table III-A or III-B or III-C; **or**

3. Arterial blood gas values of $PO_2$ and simultaneously determined $PCO_2$ during steady state exercise breathing room air (level of exercise equivalent to or less than 17.5 ml $O_2$ consumption/kg/min or 5 METs) equal to or less than the values specified in the applicable table III-A or III-B or III-C in 3.02 C2.

The ALJ found that Claimant's COPD did not meet or equal the criteria set forth in any of the listings under section 3.00. (Tr. at 15). This conclusion is supported by substantial evidence. Prior to the alleged onset date, Claimant was diagnosed as suffering from COPD in 1998. (Tr. at 157). The next discussion of Claimant's COPD took place on June 28, 2010, several years after the date last insured, when Claimant re-established primary care at Holzer Clinic. (Docket No. 9-1 at 12–14). There are simply no records pertinent to the relevant time period that provide the specific information regarding Claimant's COPD needed to satisfy the criteria for Listing 3.02. Moreover, none of Claimant's other impairments affected his respiratory system. Therefore, Claimant cannot satisfy the criteria for Listing 3.02.

To satisfy the criteria for Listing 3.09, Claimant must demonstrate clinical evidence of cor pulmonale (documented according to 3.00G) with: "(A) Mean pulmonary artery pressure greater than 40 mm Hg; **or** (B) Arterial hypoxemia. Evaluate under the criteria in 3.02C2." As previously noted, there are simply no records from the relevant time period that provide the specific information regarding Claimant's COPD needed to satisfy the criteria for Listing 3.09. And, as Claimant's other impairments did not affect his respiratory system, Claimant is unable to demonstrate that his impairments in combination satisfy the criteria for Listing 3.09.

Turning to Claimant's impairments related mental functioning, the ALJ found

that "[Claimant's] mental impairments, considered singly and in combination did not meet or medically equal the criteria of listings 12.02, 12.04, 12.06, and 12.09." (Tr. at 15). The ALJ evaluated the medical evidence to determine if Claimant satisfied the "paragraph B" criteria. (*Id.*). Specifically, the ALJ reviewed Claimant's testimony regarding his daily activities and the agency assessments of Claimant's mental functioning. (*Id.*). To satisfy the criteria for Listing 12.02, Claimant must demonstrate:

> [p]sychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.[7]

The ALJ's conclusion that Claimant did not satisfy the requirements of Listing 12.02 is supported by substantial evidence. Treatment records from the relevant time period do not contain any information regarding the status of Claimant's mental impairments. The only evaluations of the severity and functional impact of Claimant's mental impairments were performed by state agency experts, Catherine Van Verth Sayre, MA and Holly Cloonan, Ph.D. (Tr. at 215–18, 219–37). Ms. Sayre found that Claimant's prognosis was "fair" and concluded that he was capable of managing his own benefits. (Tr. at 218). With respect to Claimant's claim of disability, Dr. Cloonan stated that Claimant's condition did not meet or equal the severity level of the listing. (Tr. at 236). Therefore, Dr. Cloonan recommended that Claimant work in a job with simple activities with low productions demands and limited interactions with others in a low

---

[7] See *Disability Evaluation Under Social Security*, 12.00 Mental Disorders – Adult at http://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm for the A, B, and C requirements.

stress work environment. (*Id.*). James Binder, MD, reviewed Dr. Cloonan's assessment and affirmed its conclusions. (Tr. at 249). Neither state agency expert found that Claimant satisfied any paragraph B or paragraph C criteria. Nor did either expert find that Claimant was disabled. Claimant has not satisfied the criteria for Listing 12.02.

Similarly, Claimant does not satisfy the criteria for Listing 12.04. Listing 12.04 concerns affective disorders:

> [c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.[8]

The ALJ's finding that Claimant did not satisfy the criteria for Listing 12.04 is supported by substantial evidence. Claimant satisfied the requirements for paragraph A: he exhibited appetite disturbance, sleep disturbance, decreased energy, and feelings of guilt or worthlessness. However, no medical source expert found that Claimant satisfied the requirements of paragraph B or C. Moreover, Claimant does not make any argument that he satisfies the requirements of either paragraph. Consequently, Claimant did not satisfy the criteria for Listing 12.04 and the ALJ's finding was supported by substantial evidence.

The ALJ's finding that Claimant did not satisfy the criteria for Listing 12.06 is also supported by substantial evidence. In anxiety related disorders:

> anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the

---

[8] *Id.*

- 37 -

obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.[9]

Claimant's history of treatment for anxiety related panic attacks prior to the alleged onset date is well-documented. Following the alleged disability onset date, state agency experts credited Claimant's statements regarding his continued suffering from anxiety and panic attacks. However, again, no treating source or state agency expert found that Claimant satisfied the requirements of paragraph B or C. Nor did any of Claimant's other mental impairments in combination satisfy the requirements of paragraph B or C. Consequently, the ALJ's finding that Claimant did not satisfy the criteria for Listing 12.06 was supported by substantial evidence.

Finally, the ALJ's finding that Claimant did not satisfy the criteria of Listing 12.09 is supported by substantial evidence. Substance abuse disorders rise to the level of disability when they result in:

[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.

The required level of severity for these disorders is met when the requirements in any of the following (A through I) are satisfied.

A. Organic mental disorders. Evaluate under 12.02.

B. Depressive syndrome. Evaluate under 12.04.

C. Anxiety disorders. Evaluate under 12.06.

D. Personality disorders. Evaluate under 12.08.

E. Peripheral neuropathies. Evaluate under 11.14.

F. Liver damage. Evaluate under 5.05.

---

[9] *Id.*

G. Gastritis. Evaluate under 5.00.

H. Pancreatitis. Evaluate under 5.08.

I. Seizures. Evaluate under 11.02 or 11.03.

Claimant's long-term alcohol use was well-documented in the treatment records for the time period prior to Claimant's alleged disability onset date; yet, Claimant makes no argument as to how Claimant's alcohol abuse in combination with other impairments satisfies the Listing under 12.09. To the contrary, Claimant strenuously disputes any supposition that his alcohol use had an impact on his daily activities, his employment history, or his ability to engage in basic work activities. Ms. Sayre noted that Claimant reported drinking four to ten beers every night to relax and sleep. (Tr. at 216). Claimant denied that this affected his ability to work. (*Id.*). Dr. Cloonan noted that Claimant was forthcoming about his alcohol abuse. (Tr. at 231). Significantly, neither state agency expert found that Claimant's alcohol abuse was severe enough to establish a disability. Therefore, the ALJ's decision finding that Claimant's alcohol abuse did not satisfy the requirements of Listing 12.09 is supported by substantial evidence.

Assuming *arguendo* that Claimant's argument is not that his impairments are medically equivalent to a listed impairment, but that the overall functional consequence of his combined impairments meets the statutory definition of disability, the analysis shifts from the Listing to the ALJ's RFC findings and the remaining steps of the sequential evaluation. As the Fourth Circuit Court of Appeals stated in *Walker v. Bowen,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together,

is to render claimant unable to engage in substantial gainful activity." 889 F.2d 47, 50

(4th Cir. 1989). The social security regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523. Where there is a combination of impairments, the issue "is not

only the existence of the problems, but also the degree of their severity, and whether,

together, they impaired the claimant's ability to engage in substantial gainful activity."

*Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be

fractionalized and considered in isolation, but considered in combination to determine

the impact on the ability of the claimant to engage in substantial gainful activity.

*Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir. 1985).  The cumulative or synergistic

effect that the various impairments have on claimant's ability to work must be

analyzed.  *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

Here, the ALJ took into account the exertional and non-exertional limitations

that resulted from Claimant's medically determinable impairments in determining

Claimant's RFC. The ALJ restricted Claimant to medium exertional work based on his

numerous medical impairments. (Tr. at 15–19). Further, the ALJ found that Claimant

could only occasionally climb, stoop, kneel, crouch, crawl, and balance; should avoid

concentrated exposure to extreme heat and cold; avoid vibration, fumes, odors, gases,

dusts, poor ventilation; and avoid even moderate exposure to hazards. (*Id.*). Based on

Claimant's limitations with respect to mental functioning, the ALJ concluded that

Claimant should be restricted to work involving only routine adaptation to changes; no

contact with the public, occasional contact with coworkers and supervisors; and simple activities that could be learned in one or two steps, by oral instructions. (*Id.*). The ALJ provided a thorough review of the objective medical evidence and the subjective statements of Claimant, correctly noting that there simply were no opinions from treating sources regarding the extent or functional impact of Claimant's alleged impairments during the relevant time period. (Tr. at 19). Moreover, at the administrative hearing, the ALJ presented the vocational expert with a hypothetical question that required the expert to take into account Claimant's impairments in combination. She asked the expert to assume that Claimant had the exertional limitations identified in his RFC assessment, as well as additional postural and environmental limitations. (Tr. at 51). Despite being asked to assume all of these restrictions, the vocational expert opined that Claimant could perform certain jobs that existed in significant numbers in the economy. (Tr. at 52).

The ALJ's conclusion that Claimant's combination of impairments was not so severe as to preclude Claimant from engaging in substantial gainful activity is amply supported by the medical record. The medical record indicates that Claimant's spine, neck and knees all showed signs of mild degenerative changes. Claimant was still able to ambulate effectively despite this mild degenerative deterioration. Claimant's heart and lungs were both found to be within normal limits. Claimant's activities of daily living were moderately limited at most and medical records show no episodes of decompensation. No treating source or state agency source found that Claimant's impairments separately or in combination prevented him from engaging in substantial gainful activity. In Claimant's RFC assessment, the reviewing physician found that Claimant could engage in medium level exertional work with certain postural and

environmental limitations. In light of this substantial evidence, the Court is satisfied that the ALJ adequately considered and accounted for the overall functional impact of Claimant's combined impairments.

### C.    Credibility Determination

Next, Claimant asserts that the ALJ's credibility finding was improper. (Pl.s' Br. at 8). Specifically, Claimant asserts that "it is clear from the record that the ALJ failed to properly assess [Claimant's] credibility by holding the lack of medical documentation of his conditions against him." (*Id.*). Claimant emphasizes that that Claimant's well-established work record entitled him to substantial credibility regarding his claim that he was disabled and unable to work. (*Id.* at 16). Citing SSR 96-7p, Claimant argues that, beyond a conclusory statement, the ALJ "failed to state what allegations were credible, the weight given to [Claimant's] statements and the reasons for affording such weight." (*Id.*). Therefore, Claimant contends a remand is appropriate in this case. The Court disagrees.

Social Security Ruling 96-7p clarifies the two-step process by which the ALJ must evaluate symptoms, including pain, pursuant to 20 C.F.R. § 416.929, in order to determine their limiting effects on a claimant.  First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain.  SSR 96-7p. "[S]ubjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Johnson v. Barnhart,* 434 F.3d 650, 657 (4th Cir. 2005) (quoting *Craig,* 76 F.3d at 591). *See also* 20 C.F.R. § 416.929(c)(3). Once the ALJ finds that the conditions could be expected to

produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. 20 C.F.R. § 404.1529. Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by a claimant to support the alleged disabling effects. SSR 96-7p sets forth the factors that an ALJ should consider in assessing a claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. In determining a claimant's credibility, an ALJ must take into consideration "all the available evidence," including: the claimant's subjective complaints; claimant's medical history, medical signs, and laboratory findings;[10] any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.);[11] and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and other factors relating to functional limitations and restrictions.[12] *Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996).  An ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ.  20 C.F.R. § 404.1529.  An ALJ's credibility finding:

---

[10] *See* 20 C.F.R. § 404.1529(c)(1).

[11] *See* 20 C.F.R. § 404.1529(c)(2).

[12] *See* 20 C.F.R. § 404.1529(c)(3).

must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96-7p.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence ... or substitute its own judgment for that of the Commissioner." *Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Ultimately, credibility determinations as to a claimant's testimony regarding her limitations are for the ALJ to make. *Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively*, 739 F.2d at 989–90 (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976)).

In the present case, the ALJ complied with the requirements of 20 C.F.R. § 404.1529 and SSR 96-7p in making a credibility determination. In her opinion, the ALJ analyzed the medical record and evaluated Claimant's credibility as follows:

After careful consideration of the evidence, the undersigned finds that

- 44 -

> [Claimant's] medically determinable impairments could reasonably be
> expected to cause the alleged symptoms; however, [Claimant's]
> statements concerning the intensity, persistence and limiting effects of
> these symptoms are not credible to the extent they are inconsistent with
> the above residual functional capacity assessment.

(Tr. at 17–18). Presumably, Claimant argues that this paragraph is a single, conclusory

statement that "the individual's allegations have been considered" or that "the

allegations are (or are not) credible[,]" which is prohibited by SSR 96-7p. When read in

isolation, this paragraph is indeed conclusory in nature. However, a reading of this

paragraph in the context of the ALJ's full written decision confirms that in making the

credibility determination, the ALJ thoroughly reviewed Claimant's testimony and

compared it with the objective medical evidence and the ALJ's observations of

Claimant at the administrative hearing, in keeping with the directives of SSR 96-7p.

The ALJ reviewed the findings of Dr. Monderewicz, Ms. Sayre, Dr. Cloonan, and Dr.

Reddy. (Tr. at 16–17). Next, the ALJ compared these objective findings to Claimant's

testimony at the administrative hearing:

> [Claimant] first stated that he could not read or write but later said he
> could read small words. His previous jobs were both semi-skilled.
> [Claimant] has a long history of alcohol abuse and apparently drinks
> every day in order to relax and sleep at night. He has never had a period
> of sobriety so it is unclear how much his drinking is affecting his mood
> disorders. He takes medication for his anxiety but has had no treatment
> for it. He has complained of diffuse arthritic pain but there is no real
> treatment or diagnostic studies prior to his [date last insured]. He stated
> he takes Lyrica for burning in his legs but there is nothing in the medical
> record to support why. [Claimant's] attorney argued that his drinking
> should not be an issue now because he worked for many years while
> maintaining the same level of drinking. However, his anxiety and reports
> of depression are affected by his daily drinking. He has testified he was
> laid off from his job but without a report from his employer, there is no
> way of knowing how his alcohol use affected his job. He did have two
> accidents on the job which may or may not have been related to alcohol
> use.

(Tr. at 18). Based on the objective medical record, the ALJ concluded that Claimant's

testimony regarding the limiting effects of his impairments was not credible.

Further, Claimant argues that in evaluating his credibility, the ALJ ignored Claimant's well-established work history. Specifically, Claimant cites a Second Circuit Court of Appeals decision and numerous unpublished district court opinions from New York for the proposition that "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Archambault v. Astrue*, 2010 WL 5829378 at *34 (S.D.N.Y. 2010). Similarly, Claimant quotes *Garrett v. Astrue*, in which the Court held that "the ALJ should have considered plaintiff's 'efforts to work,' including her history of work as a Developmental aide and her subsequent unsuccessful attempt to work part-time." 2007 WL 4232726 at *9 (W.D.N.Y. 2007) (citations omitted). The Court has considered this argument and finds it unpersuasive. First, the decisions that Claimant cites are not binding on this Court as they are not from the Fourth Circuit Court of Appeals. Many of the decisions cited by Claimant for this proposition are unpublished district court opinions. Second, the Court in *Archambault* and *Garrett* placed emphasis on the plaintiffs' efforts to return to work following their injury. Claimant's testimony at the administrative hearing indicates that Claimant did not make a similar effort to return to work following his lay-off in July 2003. Third, credibility determinations are ultimately for the ALJ to make based on the objective medical findings, the evidence of record, and Claimant's testimony and conduct at the administrative hearing. *Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984). The requirement that the ALJ make a credibility determination based on these factors would be meaningless if a long work history *standing alone* established "substantial credibility." Fourth, and most significantly, the ALJ's decision did take into consideration Claimant's well-established work history.

(Tr. at 16–18). Although Claimant's work history is commendable, it is not sufficient in and of itself to entitle Claimant to "substantial credibility" given the lack of evidence corroborating Claimant's testimony.

The ALJ's credibility finding is supported by substantial evidence. At the administrative hearing, Claimant testified at length regarding the intensity, persistence, and limiting effects of his medical impairments. He stated that driving caused his lower back to hurt and resulted in swelling in his hands. (Tr. at 26). After being laid off from work in July 2003, Claimant reported increased pain in his back, neck, arms, legs, and feet that hurt too much to allow him to work. (Tr. at 28-30). When asked about medical treatment, Claimant reported that he had not received much treatment because he lacked medical insurance. However, the record strongly suggests that when Claimant had acute symptoms, he sought treatment regardless of his financial limitations, giving rise to a reasonable inference that Claimant's only serious medical concern during the relevant time period was the shoulder and extremity pain that led to his solitary emergency medicine visit. (*Id.*). Claimant stated that he had been diagnosed with fibromyalgia and arthritis. (Tr. at 30–31). However, he admitted that he not been prescribed any medication for joint pain prior to his date last insured. (Tr. at 32). Claimant testified to his long history of anxiety, depression, and panic attacks, yet the record confirms that Claimant worked for many years while he had these conditions. (Tr. at 32–34). With regard to his difficulty breathing, Claimant acknowledged that he smoked two packs of cigarettes per day and had not decreased this habit. (Tr. at 35). Claimant testified that he had difficulty lifting heavy things and estimated that the most he could lift was 20 pounds. (Tr. at 37–38). He described difficulty standing, stating "[m]y feet feel like they're walking on hot coals.

My legs hurt . . . I couldn't stand for very long. My legs and back and everything hurts. I got to stand for a while. I got to sit for awhile. If I sit very long I get stiff so I've got to get back up." (Tr. at 37). Similarly, Claimant reported difficulty sitting, explaining "[i]f I sit too long my wife, she has to help me up out of the recliner" and that he could sit at most for 45 minutes at a time. (*Id.*). Yet, during the relevant time period, the only existing treatment record plainly does not corroborate this magnitude of debilitation. (Tr. 188–94). To the contrary, Claimant's April 26, 2005 Emergency Department visit at Pleasant Valley Hospital establishes that Claimant's symptoms were much less severe and persistent than he recounted at the hearing. The visit was prompted when Claimant suffered an injury "after carrying a total of 12 [8 feet by 4 feet pieces of] sheet rock then 2 days later [hanging 4 8 feet by 4 feet pieces of] sheet rock by himself resting sheets on [his] head." (Tr. at 190). Accordingly, Claimant was obviously capable of engaging in very heavy labor for some time **after** the alleged disability onset date. Moreover, the treating physician noted that prior to seeking treatment at the hospital, Claimant reported that he had been able to go "turkey hunting with lots of walking" without suffering any pain or shortness of breath. (*Id.*). Again in stark contrast to his testimony, Claimant's contemporaneous statements verify his ability to engage in vigorous hobbies **after** the alleged disability onset date. The examining physician diagnosed Claimant with neck and thoracic pain with radiculopathy in his left upper extremity and recommended that Claimant not lift more than five pounds while recovering from his injury. (*Id.*). However, nothing in the treating source's report implies that this recommendation was anything more than a temporary rehabilitative suggestion. No further treatment records substantiate that such a limitation was required, and Claimant apparently sought no follow-up care. Consequently, the record

is not only void of evidence to support Claimant's testimony that he was unable to engage in substantial gainful activity, but the few available records lead to the opposite conclusion. Similarly, numerous state agency experts examined Claimant or reviewed his medical records. No state agency physician found that Claimant was disabled and unable to engage in substantial gainful activity. These state agency experts credited Claimant's statements regarding his anxiety, depression, and panic attacks and also diagnosed him with COPD and chronic back, neck, and knee pain. Nonetheless, their evaluations contain no statements or findings that would substantiate the degree of the severity, intensity, and persistence of Claimant's impairments as he described at the administrative hearing. In view of the objective medical evidence and the opinions of treating sources, the ALJ's credibility finding was appropriate and supported by substantial evidence.

### D.  Treating Physician's Opinion

In his final assertion of error, Claimant asserts that the ALJ failed to properly consider the opinions of Claimant's treating physicians. (Pl.'s Br. at 9). Specifically, Claimant argues that "the ALJ's Decision did not mention a single one of [Claimant's] treating physicians nor did the Decision cite to a single medical record from one of [Claimant's] treating physicians." (*Id.*). Citing *Crockett v. Astrue*, Claimant emphasizes that "greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide a 'detailed, longitudinal picture' of a claimant's alleged disability." 2010 WL 5634382 (S.D.W.V. 2010) (citation omitted). As the ALJ failed to consider the records of Claimant's treating physicians, Claimant contends that a remand is warranted in the present case. The Court finds this argument to be without merit.

20 C.F.R. § 404.1527(d) outlines how medical opinions will be weighed in determining whether a claimant qualifies for disability benefits.  In general, the Social Security Administration will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source.  *See* 20 C.F.R. § 404.1527(d)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  *See* 20 C.F.R. § 404.1527(d)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. § 404.1527(d)(2).

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. § 404.1527(d)(2). If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(d)(2)-(6).  These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors.  "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. Ultimately, it is the responsibility of the Commissioner, not the court, to evaluate the case, make findings of fact, and resolve conflicts of evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). When a treating source's opinion is not given controlling weight,

and the opinions of agency experts are considered, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources." 20 C.F.R. § 404.1527.  The regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." *Id.* § 404.1527(d)(2).

In the instant case, much of Claimant's memorandum is devoted to the contention that the ALJ ignored the records of Claimant's treating physicians. (Pl.'s Br. at 10–15). Claimant reviews the evaluations of the state agency experts and identifies numerous findings of fact that Claimant believes are unsubstantiated by the record. Claimant further challenges much of the methodology that state agency experts used in evaluating Claimant's impairments. In arguing for remand of this case, Claimant asserts that "[i]t is clear that the ALJ's failure to refer to any of the treating physicians or their treatment notes evidences that the ALJ drew an inference[13] about [Claimant's] failure to seek or pursue regular medical treatment." (Pl.'s Br. at 10). Significantly, Claimant does not identify any records from treating sources that the ALJ should have considered in her evaluation of Claimant's claim of disability.

Although Claimant's lack of medical treatment during the relevant period may be perfectly legitimate and understandable, the reason underlying a lack of objective medical evidence does not alter the burden on Claimant to prove the existence of a disability on or before his date last insured. 20 C.F.R. §§ 404.1512(a) and 416.912(a).

---

[13] Claimant does not identify or explain what "inference" he believes the ALJ to have drawn.

*See Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") As previously summarized above, Claimant had extensive documentation of medical treatment prior to July 15, 2003 (the alleged disability onset date) and following December 31, 2007 (Claimant's date last insured). However, the only treatment record submitted by Claimant that directly referenced his condition during the relevant time frame was the April 26, 2005 Emergency Department record from Pleasant Valley Hospital.[14] (Tr. 188–94). This record documented an isolated evaluation of Claimant by an Emergency Department physician and did not present a longitudinal history of Claimant's medical treatment. The record provides no opinions related to Claimant's function-by-function capability, nor indicates the existence of any debilitating or disabling limitations that existed for over one year or were expected to exist that long into the future. Ultimately, the treating source at Pleasant Valley diagnosed Claimant with chronic neck and back pain. Despite not explicitly discussing the Pleasant Valley Hospital records,[15] the ALJ properly incorporated those diagnoses into her written decision. The Pleasant Valley Hospital records do not provide any opinions or findings that contradict or are contrary to the opinions and findings of the agency consultants. Moreover, the ALJ implicitly credited the records in her finding that Claimant's chronic neck and back strain were severe impairments. Therefore, Claimant's argument that the ALJ failed to consider the opinion of Claimant's treating

---

[14] While records outside of this time period may provide context for an analysis of Claimant's medical history, the ALJ was not required to discuss them.

[15] The ALJ did explicitly discuss the state agency physicians' findings which incorporated Claimant's Pleasant Valley diagnosis of chronic neck and back pain.

physicians and that this failure provides a legitimate ground for remand lacks a basis in fact and law.

## VIII.  **Conclusion**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  February 1, 2012.

Cheryl A.  Eifert
United States Magistrate Judge